UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES RAY DAUGHERTY, STEVE DANIEL ALLEN, WILLIAM ORMAN KNOX, J.C. HOLLINGSWORTH, DARYLE RYCARDO DOWELL, SR., RICKY WILFORD BALTHROP, SHELIAH RHONDA HUNTER, WILLIAM ROBERT MAUPIN, STEVEN EDWARD COUNTER, ROBERT S. HEATHCOCK, KERRY B. STAMPER, DONNA FAY REKART, JOHNNY LEE BUTLER, TOM BAKER JOHNSON, BRENDA COLEMAN, REBECCA SPICER, DONALD ALLEN SPILLERS, DENNIS ALAN BRAZZELL, and KENNY WAYNE JOHNSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 3:08-cv-00695 JUDGE SHARP MAGISTRATE JUDGE BROWN |
| v. | ) ) ) | |
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA ("UAW") and UNITED AUTO WORKERS LOCAL UNION 737 ("LOCAL 737"), | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM**

Defendants UAW and Local 737 (collectively, "Defendants" or "Unions") filed a Second Motion for Summary Judgment (Docket Entry No. 69), to which Plaintiffs James Ray Daugherty, Steve Daniel Allen, William Orman Knox, J.C. Hollingsworth, Daryle Rycardo Dowell, Sr., Ricky Wilford Balthrop, Sheliah Rhonda Hunter, William Robert Maupin, Steven Edward Counter, Robert S. Heathcock, Kerry B. Stamper, Donna Fay Rekart, Johnny Lee Butler,

1

Tom Baker Johnson, Brenda Coleman, Rebecca Spicer, Donald Allen Spillers, Dennis Alan Brazzell, and Kenny Wayne Johnson (collectively, "Plaintiffs") filed a response[1] (Docket Entry No. 73), and Defendants filed a reply (Docket Entry No. 90). Having obtained prior leave of the Court, Plaintiffs (Docket Entry No. 95) and Defendants (Docket Entry No. 99) each filed a sur-reply. For the reasons stated herein, the Court will deny Defendants' motion.

## FACTS

This action involves the retirement packages offered to and accepted by Plaintiffs, who previously worked at the Ford Motor Company ("Ford") glass plant in Nashville and were members of Local 737.[2] Ford sold the facility to Visteon in 2000. Ford, Visteon, and UAW negotiated a Memorandum of Agreement ("Memorandum") in 2005 concerning the restructuring of Visteon. (Docket Entry No. 73-25.) The Memorandum provided for Visteon's transfer of certain facilities, including the Nashville glass plant, to a third party-owned, Ford-controlled limited liability company known as Automotive Components Holdings ("ACH"). Most of the facilities transferred pursuant to the Memorandum, including the Nashville glass plant, were designated for restructure and sale. (*Id.* at 2.)

---

[1] Plaintiffs filed their response to Defendants' motion and related materials under seal, claiming that Defendants had designated some of the underlying documents as confidential. Magistrate Judge Brown ordered that, absent a showing of cause why the documents should be sealed, the Clerk should unseal the documents within fourteen days. (Docket Entry No. 86.) The parties made no such showing of cause. In fact, Defendants filed a statement of non-opposition to lifting the seal. (Docket Entry No. 88.) However, the Clerk never unsealed the documents. Therefore, in its Order accompanying this motion, the Court shall also direct the un-sealing of Plaintiffs' response and the related materials.

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Entry Nos. 69-1 and 75) and related declarations and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, Charles Browning, Assistant Director of UAW's National Ford Department, and Thomas "Butch" Stokes, Local 737's bargaining chairman, consistently testified that Ford would consider closing any such plant if there was no suitable buyer. In fact, some of the plants designated in the Memorandum for restructure and sale were ultimately closed instead.

Ford and UAW representatives came to the Nashville facility in October 2006 to hold a mandatory meeting with Plaintiffs and the other members of Local 737. The UAW representatives stated that, if Ford could not sell the plant, it would be closed and all its employees laid off by September 1, 2007. UAW representatives Joe Gafa and Jerry Young explained Ford was making available a onetime buyout package that would allow retirement-eligible employees at ACH facilities to draw part of their retirement and keep their health insurance. These packages were represented to be the only ones available, with no promise of other packages to come later. The representatives further indicated that Ford could lay off those employees who did not sign up for a package, thus eliminating their health insurance within a short time and severely affecting their retirement benefits. While these laid-off employees would receive SUB-pay supplemental unemployment benefits, the representatives warned that the sheer number of such employees would quickly deplete the available SUB-pay funds. Although employees could alternatively request a transfer, that option was described as risky because employees who did not rank highly enough on the seniority list would also be laid off.

Local 737 members were given two weeks to decide whether to sign up for a retirement package, request a transfer to another facility, or continue working at the Nashville glass plant. Members who signed up for a buyout package could withdraw their

acceptance at any time before the effective date of the buyout. Individual Plaintiffs testified about various conversations with Local 737 representatives which essentially reinforced the message of the October 2006 meeting: the plant was at risk of closure and employees should consider taking the buyouts. All Plaintiffs ultimately accepted the buyout packages because they were told this package would be the only one, and no other, better package would be offered subsequently. Plaintiffs left their employment with Ford between December 2006 and August 2007.[3] By contrast, over 60% of the Local 737 bargaining unit, including all of its elected officials, turned down these buyout packages.

During this period of time, prospective buyers toured ACH facilities, such as the Nashville glass plant. Updates on the sale negotiations were discussed at non-mandatory, sparsely attended Local 737 monthly membership meetings. In a May 2007 press release, Ford disclosed that sales negotiations for ACH facilities, including the Nashville glass plant, were ongoing (Docket Entry No. 99-3.) Glass Products, LLC (later "Zeledyne") ultimately purchased the Nashville glass plant and another ACH facility in Tulsa, Oklahoma. Glass Products, LLC first expressed a written intent to purchase the Nashville facility on September 6, 2007, and the consummated sale transaction was officially announced in an April 14, 2008 press release.

In early 2008, Ford made a second retirement package offer to employees of the Nashville glass plant that included better benefits than the packages Plaintiffs had accepted. Furthermore, those who accepted the 2008 offer received a higher level of benefit because they had accumulated more seniority in the interim since Plaintiffs' retirement.

---

[3] Certain employees who accepted the packages in 2006 (including some Plaintiffs) requested and received extensions of their departure date until various times in the first half of 2007.

At their depositions, Browning and Stokes testified that certain facts were contrary to what Plaintiffs and other Local 737 members had been told at the October 2006 mandatory meeting. Specifically, Browning testified the UAW had not been concerned about the level of the SUB-pay fund and he was not aware of any risk of SUB-pay being severely depleted. (Docket Entry No. 73-22, at 75-76.) Also, Stokes testified that it was false to state that laid-off workers who had not accepted the retirement packages were at risk of shortly losing their health insurance and having their retirement benefit severely reduced. (Docket Entry No. 73-23, at 68.)

Ford and UAW's Ford Department periodically negotiate the Master Agreement, which governs the terms and conditions of employment for UAW-represented employees in all of Ford's United States facilities. UAW members vote to ratify each iteration of the Master Agreement and have access to its terms for their personal review. Appendix M of the Master Agreement explains the terms of eligibility for the Guaranteed Employment Numbers (GEN) program. (Docket Entry No. 73-24). Available from 1984 to 2009, the GEN-pay benefit provided for eligible laid-off employees to continue receiving their full pay, health insurance, and credit for retirement over the lifetime of the collective bargaining agreement then in effect. Ford continued to offer the GEN-pay benefit throughout the period covered by this lawsuit. Because of the potential cost of the GEN-pay benefit over a prolonged period of time, Ford stood to save money in the long run by inducing employees instead to retire or accept a buyout. While the Plaintiffs would have been subject to the Master Agreement's provisions on GEN-pay, the employees hired during the period that Plaintiffs accepted the retirement packages would not have been eligible for GEN-pay because these new employees worked for Visteon instead of Ford.

Ford required certain Local 737 officials to sign a "Confidentiality Acknowledgment" form. (*See* Docket Entry No. 73-20.) This form defined "confidential information" to include specifically (1) disclosure of the name of a potential buyer for an ACH facility, (2) the fact that discussions with a potential buyer were taking place, and (3) any information about an actual or potential bid. Signatories could be disciplined for violating the confidentiality acknowledgment. The form exempted any such information that was "generally publicly known." (*Id.*) Stokes testified that he told Local 737 members he had signed the confidentiality acknowledgment.

## **ANALYSIS**

Plaintiffs filed the original complaint in this action on July 17, 2008. Plaintiffs subsequently amended the complaint several times, and the operative pleading is now the Third Amended Complaint of December 18, 2008. (Docket Entry No. 23.) On March 31, 2010, another department[4] dismissed all of Plaintiffs' causes of action except a claim for breach of the duty of fair representation, pursuant to Section 9(a) of the Labor Management Relations Act. *See* 29 U.S.C.A. § 159 (1998). (Docket Entry No. 38.) Defendants' first motion for summary judgment on the remaining claim was denied without prejudice so that Plaintiffs might have opportunity to depose Defendants' representatives. (Docket Entry No. 66.) In this renewed motion, Defendants contend that Plaintiffs' section 9(a) claim is time-barred and fails as a matter of law.

### I.   **Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir.

---

[4] The case was reassigned to this Court on June 1, 2011. (Docket Entry No. 64.)

2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See University of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008); *Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Statute of Limitations

The six-month statute of limitations of section 10(b) of the Labor Management Relations Act governs an action for a union's alleged breach of the duty of fair representation. *See* 29 U.S.C.A. § 160(b) (1998); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172 (1983); *Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 366 (6th Cir. 2011). "[T]he limitations period begins to run when the potential plaintiff 'knows or should have known of the union's alleged breach of its duty of fair

representation.'" *Ratkosky v. United Transp. Union*, 843 F.2d 869, 873 (6th Cir. 1988) (quoting *Dowty v. Pioneer Rural Elec. Co-Op., Inc.*, 770 F.2d 52, 56 (6th Cir. 1985)).

Plaintiffs claim that their July 17, 2008 complaint is timely because the better packages were offered beginning in mid-February 2008. Defendants claim that Plaintiffs should have known earlier, although Defendants' position has not been consistent regarding the date of Plaintiffs' constructive knowledge. In Defendants' prior summary judgment motion, for example, Defendants claimed it was an undisputed fact that Ford did not make its second round of retirement offers to employees of the Nashville glass plant until January 2008, pursuant to three-way negotiations among Ford, UAW, and Zeledyne. (Docket Entry No. 39-1, at 7.) Furthermore, the additional offers were "a direct result of Zeledyne's offer" to purchase the Nashville glass plant, and "[t]he UAW had no means to anticipate the details of the proposed benefit packages until they were negotiated with Ford as part of the purchase process." (*Id.*) The terms of those offers depended on the Ford-Zeledyne sales negotiations, and the completed purchase was not announced under April 2008. (*Id.* at 8.) Therefore, Defendants' prior motion essentially makes the argument for Plaintiffs as to why the trier of fact, rather than this Court, must decide whether the action is time-barred. Summary judgment is inappropriate on statute of limitations grounds.

### III. Duty of Fair Representation

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Bowerman*, 646 F.3d at 368. "Under this tripartite standard, a court should look to each element when determining whether a union violated its duty." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir.

2010) (citing *Air Line Pilots Int'l v. O'Neill*, 499 U.S. 65, 77 (1991)); *cf. Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994) ("Thus, the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty.").

"A union's actions are arbitrary 'only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Bowerman*, 646 F.3d at 368 (quoting *O'Neill*, 499 U.S. at 67). Discretionary judgments are not arbitrary merely because they subsequently turn out to be wrong. *Id.* (citing *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998)). A showing of discriminatory action "'carries with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.'" *Merritt*, 613 F.3d at 619 (quoting *Amalgamated Ass'n of Street, Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). Finally, "'[t]o show bad faith, a plaintiff must show evidence of fraud, deceitful action, or dishonest conduct.'" *Hayes v. UPS*, 327 F. App'x 579, 585 (6th Cir. 2009) (quoting *Summers v. Keebler Co.*, 133 F. App'x 249, 253 (6th Cir. 2005) (citing *Humphrey v. Moore*, 375 U.S. 335, 348 (1964))). With respect to each of these three prongs, mere negligence is insufficient to establish a claim for breach. *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372-73 (1990); *Mains v. LTV Steel Co.*, 89 F. App'x 911, 918 (6th Cir. 2003).

Applied to this case, Plaintiffs' response relies heavily on information Plaintiffs obtained during the recent deposition discovery period. In particular, Plaintiffs make much of the GEN-pay benefit and Defendants' failure to disclose Plaintiffs' potential eligibility for it. According to Plaintiffs' theory, Defendants must have known that Ford would somehow come up with better buyout or retirement packages because Ford emphatically did not want the expense of

9

GEN-pay. Plaintiffs have overstated the legal significance of GEN-pay, however. Eligibility for GEN-pay benefits is clearly set forth in Appendix M of the Master Agreement, an agreement ratified by UAW members (including the Plaintiffs) and readily accessible for Plaintiffs' review. If Plaintiffs believed the union's presentation in the October 2006 meeting knowingly and deliberately contradicted the Master Agreement's terms concerning GEN-pay, they should have filed suit within the six-month statute of limitations, instead of waiting a year and nine months to initiate this litigation. Furthermore, the record before the Court belies the assumption that the Unions must have known subsequent packages were coming. Instead, the consistent, unrebutted testimony of Defendants' representatives reflects that, while the Memorandum said the Nashville glass plant would be restructured and sold, Ford was prepared to close the facility if a buyer did not materialize. Nor does the record indicate that, at the time of the October 2006 meeting (or even prior to the effective dates of the buyout packages that Plaintiffs accepted), Defendants ever knew the Nashville glass plant would find any buyer, much less a buyer that would offer more generous retirement packages. At most, the Unions negligently predicted the worst-case scenario and guessed wrong about the future of the Nashville glass plant, and such a mistake in judgment is not cognizable. *Bowerman*, 646 F.3d at 368 (citing *Marquez*, 525 U.S. at 45-46).

Relatedly, Plaintiffs rely too much on the confidentiality acknowledgment forms that, under penalty of disciplinary action, prohibited the Unions' officials from disclosing information about potential bids or buyers for ACH-held facilities. While the scope of these agreements included the fact of discussions with a potential buyer, the agreements exempted "generally publicly known" information. Ford made ongoing negotiations about the purchase of the Nashville glass plant generally publicly known through at least one press release (*see* Docket Entry No. 99-3). Furthermore, within the confines of the facility, potential buyers were

discussed at Local 737 membership meetings that Plaintiffs chose not to attend. Compliance with the confidentiality acknowledgment forms did not give rise to a breach of the duty of fair representation.

Plaintiffs' claim will survive summary judgment, however, because of a material dispute of fact whether Defendants acted in bad faith through knowingly inaccurate statements about the solvency of the SUB-pay fund and the longevity of health insurance coverage for Local 737 members who declined the October 2006 buyout packages. For purposes of summary judgment only, Defendants have admitted saying that employees who did not accept the buyout packages risked the rapid depletion of SUB-pay funds and the swift elimination of their health insurance coverage. Browning and Stokes both testified to the contrary, *i.e.*, the SUB-pay fund was adequately capitalized, and employees would not immediately lose their health insurance. Consistent with the Sixth Circuit's rule that dishonest conduct establishes bad faith, *Hayes*, 327 F. App'x at 585, other circuits have held that misrepresentation or concealment by union representatives can establish a union's breach of its duty of fair representation. *See, e.g.*, *Aguinaga v. United Food & Comm. Workers Int'l Union*, 993 F.2d 1463, 1470-71 (10th Cir. 1993); *Thomas v. Bakery, Confectionary & Tobacco Workers Union Local No. 433*, 826 F.2d 755, 759 (8th Cir. 1987); *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1397 (9th Cir. 1986).

At trial, Defendants may be able to prevail by showing that their representatives did not make these statements or made them with mere negligence of their inaccuracy. Alternatively, Defendants may be able to show the statements were accurate. In any event, because of the factual disputes surrounding the statements and their accuracy, the Court cannot resolve the duty of fair representation claim on summary judgment.

## **CONCLUSION**

For all of the reasons stated, Defendants' Second Motion for Summary Judgment (Docket Entry No. 69) will be denied. The Clerk will be directed to unseal the documents that Plaintiffs filed with their response.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE